# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| In the Matter of the Complaint of MATTESON MARINE SERVICE, INC., as owner of the M/V BETTE LYNN and M/V BRUCE T, for exoneration from or limitation of liability. | ) ) ) ) ) ) | Case No. 08-cv-4023 |
| | | Consolidated with |
| In the Matter of the Complaint of ALTER BARGE, INC. for exoneration from or limitation of liability. | ) ) ) ) | Case No. 08-cv-4056 |
| Third-Party Defendants. | ) ) ) ) | |

# O R D E R   &   O P I N I O N

This is an admiralty case brought pursuant to this Court's jurisdiction under 28 U.S.C. § 1333. Pending before the Court is Claimant BNSF Railway Company's Motion for Summary Judgment as to Liability (Doc. 100); Matteson Marine Service and Alter Barge Lines' Motion for Partial Summary Judgment with respect to damages (Doc. 101); and Matteson Marine Service and Alter Barge Lines' Motion in Limine to Exclude Expert Testimony (Doc. 98).[1]

---

[1] Also pending before the Court is Claimant Gary Neff's Motion to Join in BNSF's Motion for Summary Judgment (Doc. 112) and Claimant Douglas Sink's Motion to Join in BNSF's Motion for Summary Judgment (Doc. 113). These motions were filed with the Court on the afternoon of June 29, 2011, nearly a year and a half after the above-referenced motions had been filed, and nearly two weeks after the Court had requested courtesy copies of the above-referenced motions. There being no good cause shown for the delay in filing the instant motions, the Court hereby DENIES the Motions for Summary Judgment (Docs. 112; Doc. 113), without prejudice. If, after reading this Order, Mr. Sink and Mr. Neff wish to file new motions for summary judgment, they may do so.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

### Matteson Marine – Ownership and Management

Matteson Marine Service, Inc. is a harbor and fleeting company whose main business involves moving barges in and around the Burlington, Iowa area of the Mississippi River and keeping the barges secure in fleets. (Doc. 100 at 7). Larry Matteson, Jr., Vice President of Matteson Marine, and his father, Larry Matteson, Sr., President, purchased Matteson Marine in 1985 and are the only two stockholders. (Doc 100 at 7). Matteson, Jr. runs the company, and Matteson Sr. is uninvolved in its operations. (Doc. 104 at 7). Following a period about one year in which the previous owner stayed on to help with the transition, Matteson, Jr. brought in Jim Larsen as Port Captain in 1986. (Doc. 100 at 7). From 1986 to present, Larsen, who had no prior experience with fleeting operations, has been responsible for overseeing the pilots and deckhands in Matteson Marine's fleeting operation. (Doc. 100 at 7). Larsen reports to Matteson, Jr. (Doc. 100 at 7). As a general rule, Matteson, Jr. and Larsen do not instruct the river pilots regarding how to perform their jobs because the pilots are experienced. (Doc. 100 at 7). Larsen occasionally checks the fleets to see how they are moored to the bank or locked to each other, and to make sure the deckhands check the head wire for bad spots, as all the pilots do. (Doc. 100 at 7).

Matteson Marine has eight fleeting areas on the upper Mississippi River, with several made up of two or more sub-fleets, each sub-fleet on its own head wire.

---

[2] These background facts reflect the Court's determination of the undisputed facts, unless otherwise noted. Facts that are omitted are immaterial; if an included fact is immaterial to the Court's determination, this will be noted.

(Doc. 100 at 7). The head wire is the primary attachment for each sub-fleet to the shore. (Doc. 100 at 7). The head wire configuration generally involves a one and one-eighth inch wire from an anchor (in this case a tree) on the shore out approximately 15 feet to a used, heavy-implement road tire that has coiled wire inside of it. (Doc. 100 at 7-8). The line from the anchor runs through the center of the tire, and then comes back and is wound back into itself and clamped with a procedure known as a "farmer's eye." (Doc. 100 at 8). A separate wire of the same size and type runs from the tire to the first barge of the fleet, with farmer's eyes on either side of that wire as well. (Doc. 100 at 8). The purpose of the tire between the two separate wires is to absorb shock. (Doc. 100 at 8). As the tires wear over time, they become less flexible and more likely to snap. (Doc. 100 at 8). The head wire/tire systems are inspected visually, to the extent they can be seen, by the pilots/deckhands whenever a barge is hooked onto them. (Doc. 100 at 8). Additionally, the river usually shuts down for some period each winter, and when it opens each spring the head wire systems are inspected via Matteson's crane boat by lifting the system to the deck of the boat for the inspection. (Doc. 100 at 8). Jim Larsen orders these inspections and operates the crane boat during them. (Doc. 100 at 8). During these inspections, wires are replaced if they appear to the naked eye to be broken, frayed, or worn excessively in one spot. (Doc. 100 at 8). However, the parties dispute the frequency of replacement with respect to head wires that do not show visible signs of wear or damage. There is testimony indicating that so long as a head wire looks good, Matteson Marine leaves the wire in service, regardless of its age. (Doc. 100-7 at 75-78, Doc. 100-5 at 47-48, 50-51). There is also testimony

indicating that Matteson Marine replaces all of its head wires every 12-18 months. (Doc. 100-1 at 83). Occasionally, on an annual or semiannual basis, Matteson, Jr. goes out, usually alone by johnboat, and inspects the fleets. (Doc. 100 at 9). On these inspections, he looks for how things are being done, where their anchors are, and the age and conditions of the head wires and tires. (Doc. 100 at 9). He can tell a wire is old if it is stiff or inflexible. (Doc. 100 at 9). Occasionally, on these inspections, Matteson, Jr. has requested that Larsen replace a tire. (Doc. 100 at 9). Matteson Marine has a supply of new head wires on hand and all necessary equipment to repair or replace the head wires and tires, etc., as needed. (Doc. 100 at 9). Matteson Marine keeps no record of when head wires are replaced, as it is Matteson Marine's practice to only log activities for which they can bill customers. (Doc. 100 at 9). Absent any specific recollection by a Matteson Marine employee, the only way to figure out how long a wire or tire has been in place is by examining the condition of the wire itself. (Doc. 100 at 9).

<u>Matteson Marine – Fleeting Practices and River Conditions</u>

Matteson Marine has no written procedures for tying off barges at fleets or performing inspections on those fleets. (Doc. 100 at 9). Matteson Marine has no set policy for how fleets are to be checked or how many times they are to be checked during high water conditions. (Doc. 100 at 10). The 407 fleet is used for loaded barges because there is deeper water there. (Doc. 100-5 at 9-10). The number 5 wire sub-fleet of the 407 ("407-5"), the wire that broke on May 1, 2008, holds up to six loaded barges when full. (Doc. 100-5 at 10).

The stage of the river on any given day is at least somewhat predictable. Matteson, Jr. and other staff members can go to the National Oceanic and Atmospheric Association ("NOAA")'s website and obtain the anticipated river stage when extreme changes are expected. (Doc. 100 at 9; Doc. 104 at 3). Also, the river levels are in the local newspaper every day and the next day's forecast in the newspaper every evening. (Doc. 100 at 9). The river level information is communicated to the pilots by radio every morning. (Doc. 100 at 9). In weeks leading up to May 1, 2008,[3] the Mississippi River was rising. (Doc. 100 at 9). The Coast Guard records show repeated warnings to mariners regarding "extreme high water," as early as April 27. (Doc. 100 at 9). As early as April 26, the Matteson Marine crews were moving loads in fleets to secure for high water conditions. (Doc. 100 at 9). The 407-5 tire can be seen when the water is at flood stage (15 feet) and disappears under water when the river reaches 16 feet. (Doc. 100 at 9). Leading up to May 1, the Mississippi River had not been below 16 feet since April 13. (Doc. 100 at 9). Thus, at least 18 days had passed since anyone could have seen the tire or the wire on shore. (Doc. 100 at 9).

In 1993, and possibly on other occasions as well, there was a flood as severe as the flood experienced during the May 1, 2008 breakaway. (Doc. 100 at 9). In the 1993 flood, the Matteson Marine pilots used johnboats and tugboats to inspect the fleets every few hours. (Doc. 100 at 9-10). Matteson Marine had no breakaways during the 1993 flood. (Doc. 100 at 10). High water conditions such as those that existed in the days leading up to May 1, are tense, and the pilots have to be more

[3] Unless otherwise noted, all dates are for the 2008 calendar year.

vigilant, keeping their eyes on the fleets at all times. (Doc. 100 at 10). While both Matteson, Jr. and Larsen tell the pilots to take additional precautions in high water conditions, the specific decisions of how to fleet are left to the pilot's discretion. (Doc. 100 at 10).

In high water conditions, there are pilots assigned to watch the fleets at all times, the pilots add extra lines where possible, and the pilots try to position themselves where they can see as many of the fleets as possible. (Doc. 100 at 10). The pilots are authorized to tie off and sit at the number 6 wire of the 405 fleet. (Doc. 100 at 10). From this position, they can use their spotlights and radar to monitor the fleets. (Doc. 100 at 10).

<u>The Breakaway – April 30/May 1</u>

On April 30, 2008 in the Burlington area, Matteson Marine pilots Charles Marshall and Bruce Turner worked the day shift, and Robert Basham and Kenneth Martinson worked the night shift. (Doc. 100 at 10). In the early morning hours of May 1, while Martinson and Basham were on duty, the 407-5 head wire broke, releasing five loaded barges. (Doc. 100 at 10). On April 29, Bruce Turner had performed a drive-by check on the 407 fleet. (Doc. 100 at 10). However, in a drive-by check, the pilot and deckhand are unable to see whether a head wire is about to break. (Doc. 100 at 10). Charles Marshall also had performed a drive-by check of the 407 fleet on the morning of April 30. (Doc. 100 at 10). However, he had not instructed his deckhand to walk any of the fleets on April 30, because he felt that he had been able to see everything during the drive-by. (Doc. 100 at 10).

On April 30, Turner was on barge AGS-411B, the second barge out from the shore on the upstream end in the 407-5 fleet. (Doc. 100 at 10). Turner and his deckhand checked the entire 407-5 fleet at that time. (Doc. 100 at 11). However, due to the high water level, they could not see the tire or where the wire attached to the tree on shore. (Doc. 100 at 11). At that time, there was a head wire and two safety wires from the barge fleet to the shore. (Doc. 100 at 11).

At 6:00 pm on April 30, Martinson in the M/V Bette Lynn left to go up and sit in the fleet, check the fleets and stand by on the fleets. (Doc. 100 at 11). Among the fleets checked by Martinson was the 407 fleet. (Doc. 100 at 11). For each and every fleet, with one exception, Martinson dropped off his deckhand to walk down each barge and ensure they were properly tied to the shore and to each other. (Doc. 100 at 11). The one exception was the 407 fleet – the fleet that later broke away. (Doc. 100 at 11). While Martinson testified that any other time he would have had his deckhand walk the 407 fleet, neither Martinson nor his deckhand walked the 407 fleet because Bruce Turner has informed Martinson during the shift change that Turner had previously inspected the 407 fleet and everything had looked good. (Doc. 100 at 11).

After completing the walking inspections of other fleets and a drive-by inspection of the 407, Martinson tied off to a mooring at the number 6 wire of the 405 fleet, approximately 1 mile and a half south of the 407-5 fleet. (Doc. 100 at 11). From that position, Martinson shined his starboard incandescent light on the 405 constantly, and then every 30 minutes shined his port "xenon" light on the 407 fleet. (Doc. 100 at 11). From that distance, Martinson could not see the wires or lines on

the 407 fleet, but he could see whether or not the barges had broken loose and were drifting towards him. (Doc. 100 at 11). Martinson and his deckhand were sitting in the pilothouse together, with the deckhand sitting in the pilothouse chair. (Doc. 100 at 11). Martinson had radar on that night, set to a two-mile range, which would allow him to see the 407 fleet a mile and a half away. (Doc. 100 at 12). If Martinson had been looking at the radar at the time of the breakaway, it would probably have shown him that the 407-5 sub-fleet had broken loose and was drifting downstream. (Doc. 100 at 12). Martinson knew to keep a close eye on the radar yet he did not do so. (Doc. 100 at 12). Martinson could not see his radar in time to know the fleet had broken away because his deckhand, Mike, was sitting in a position that blocked Martinson's view of the radar screen. (Doc. 100 at 12).

At 12:45 am on May 1, Basham was sitting on the James L. at the mooring at the dock south of both the 407-5 sub-fleet and Martinson in the Bette Lynn, doing general cleaning and maintenance on the James L. (Doc. 100 at 12). After the breakaway, Matteson, Jr. asked Basham why Basham was not up with Martinson watching the fleets. (Doc. 100 at 12). Basham stated that the reason he did not assist Martinson in the fleet checks was he was in a good position to help in case of an accident in Matteson Marine's upper pool (by jumping in his truck and driving there), or if Martinson had a problem in Burlington, he could help there too. (Doc. 100 at 12-13). Matteson, Jr. deemed this response acceptable. (Doc. 100 at 13).

After the barges broke free, they floated downriver three and a half miles, past Martinson, and Martinson did not become aware of this until someone called the Matteson Marine dispatcher and informed her that five barges had broken free

and that one had already struck the MacArthur Highway Bridge, located approximately a mile upstream from the BNSF Bridge. (Doc. 100 at 13).

## Attempts to Recover Drifting Barges

Following the breakaway on May 1, Martinson, Turner, and others tried to recapture the barges. (Doc. 100 at 13). Basham caught barge AGS-431B, secured it to his boat with face wires, and then attempted to corral a second barge. (Doc. 100 at 13). Initially, Basham planned to take barge AGS-431B to a nearby dock. (Doc. 100 at 13). However, there was a third barge, the ACBL-4130, which was still astray. (Doc. 100 at 13). Consequently, both Martinson on the Bette Lynn and Basham on the James L., with barges in tow, attempted to capture the ACBL-4130, but missed. (Doc. 100 at 13). At this point, Basham could not continue to hold the AGS-431B, as Basham was dropping down river due to the strong current. (Doc. 100 at 13). Basham ran out of room and, for safety reasons, instructed his deckhand to remove the lines and release the AGS-431B into a railroad bridge owned by BNSF (the "Bridge"). (Doc. 100 at 13).

## Examination of Head Wire and Tire Following Breakaway

Afterwards, when the water receded, the tree was still there, as was the cable going from the tree to the tire and the tire itself. (Doc. 100 at 14). The wire that previously went from the tire to the barge was gone. (Doc. 100 at 14). Both the subject wire and tire were retrieved following the breakaway. (Doc. 100 at 14). With respect to the tire; Matteson, Jr., examined it and testified its condition was stretched, and that if he had seen it before the breakaway, he would have had it replaced. (Doc. 100 at 14). Martinson and Turner likewise both testified that if

they had seen the tire in that condition, they would say it needed to be changed. (Doc. 100 at 14). With respect to the wire; the parties agree that it broke at the end that was under water, in the center of an eye attached to a shackle. (Doc. 104 at 8). It is believed that the shackle wore through the eye due to a strong current and oscillation of the fleet caused by rising water during a prolonged flood. (Doc. 104 at 8).

## Attempts to Remove Barge

As soon as Matteson, Jr., learned of the breakaway in the early morning hours of May 1, he engaged Bill Carrier, a marine surveyor, to assist in determining how to remove the AGS-431B, which had become lodged on the Bridge. (Doc. 100 at 15). Furthermore, Matteson, Jr. asked Turner to assist and also contacted Alter to see if they had a line boat available to help. (Doc. 100 at 15). Bill Carrier and John Stockman, another Marine Surveyor engaged by Matteson Marine, arrived in the morning on May 1 and took charge of the operation to remove the barge. (Doc. 100 at 15). At some point, personnel from BNSF arrived on the scene and complained that Matteson Marine needed to get the barge off the Bridge quickly. (Doc. 100 at 15). The plan as to how the barge removal would be attempted was developed by mutual agreement between Carrier, Stockman, and Randy Kirschbaum, captain of the Alter line boat, the Bernard G. (Doc. 100 at 15). The plan was they would run a line from the Bernard G. to the barge, and have Matteson Marine tugs on either side to assist. (Doc. 100 at 15). There was a coil of brand new two-inch lock line available, and Carrier, Stockman and Kirschbaum agreed they would four-part it and use that line to attempt to remove the barge from the Bridge. (Doc. 100 at 15).

The reason why they parted it was because using more than one line would cost significant time to get the additional lines the exact length of the first line, and it can make the vessel harder to control.  (Doc. 100 at 16).  The crew of the Bernard G. wove farmer's eyes into each end of the lock line.  (Doc. 100 at 15).  Carrier gave them permission to try and pull it off the Bridge.  (Doc. 100 at 16).  During the pull, the line broke, causing the barge to once again hit the Bridge.  (Doc. 100 at 16).

Following this failed attempt, Matteson Marine and BNSF hired contractors to vacuum the grain off of the AGS-431B to lighten its load.  (Doc. 100 at 18). Additionally, Carrier and Stockman enlisted the assistance of an additional line boat, owned by ARTCO, located below the Bridge, which was willing and able to assist.  (Doc. 100 at 16).  ARTCO assisted in the second removal attempt and, on May 3, the barge was successfully removed from the bridge using two line boats, six lock lines, and having reduced the weight of the barge.  (Doc. 100 at 18).

On May 5, 2008, Matteson Marine filed a Complaint for Exoneration from, or Limitation of, Liability, for the damage caused by the runaway barges, which includes damage to the Bridge. (Doc. 1).  On May 19, BNSF filed a Claim against Matteson Marine for the damage caused to the Bridge by both the first and second allision,[4] asserting counts of negligence and *res ipsa loquiter*. (Doc. 10).   On February 20, 2009, BNSF filed a Claim against Alter Barge Line for the damage caused to the Bridge by the second allision, asserting counts of negligence and *res ipsa loquiter*. (Doc. 47).  BNSF now moves for partial summary judgment against

---

[4] An allision occurs when a moving vessel strikes a stationary object such as a bridge.  A collision occurs when a moving vessel strikes another moving vessel. *Fischer v. S/Y Neraida*, 508 F.3d 586, 589 FN1 (11th Cir. 2007).

Matteson Marine with respect to liability for the first allision, and against Matteson Marine and Alter Barge with respect to liability for the second allision. (Doc. 100). In addition, BNSF asks the Court to rule as a matter of law that Matteson Marine is not entitled to the benefit of the Limitation of Liability Act of 1851. (Doc. 100).

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.,* 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson,* 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

Liability in collision and allision cases has always been apportioned based on fault. *Fischer v. S/Y Neraida,* 508 F.3d 586, 593 (11th Cir. 2007). In practice, however, evidence of fault is often in the exclusive control of the defendant in an allision case. *Id.* Consequently, several judicial presumptions similar to the doctrine of *res ipsa loquitur* have evolved to shift the burden of production and persuasion to the defendant. *Id.* Of present concern are two related doctrines most commonly associated with *The Louisiana*, 70 U.S. 164 (1865), and *The Oregon*, 158 U.S. 186 (1895). The *Oregon* Rule states that when a vessel moving under its own power allides with a stationary object, the moving vessel is presumptively at fault. *See The Oregon*, 158 U.S. at 197. The *Louisiana* Rule is the same except that it applies to vessels moving or drifting due to an external force, such as the current or the wind. *See The Louisiana*, 70 U.S. at 173; *see also*, *City of Chicago v. M/V Morgan*, 375 F.3d 563, 573 FN11 (7th Cir. 2004) ("We agree . . . that whether the [boat] is deemed 'drifting' and therefore subject to the *Louisiana* presumption of fault . . . or 'under power' and subject to the *Oregon* rule, the analysis remains unchanged.")

Applying either of these rules creates a presumption that the moving vessel was negligent, but the presumption is rebuttable through any of three ways. The defendant can demonstrate: (1) that the allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was the result of an inevitable accident. *See City of Chicago v. M/V Morgan*, 375 F.3d 563, 573 (7th Cir. 2004); *S/Y Neraida*, 508 F.3d at 593; *Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 605 (5th Cir. 2010); *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 211 (2d. Cir. 2009).

The first route is essentially the contributory negligence route. *S/Y Neraida*, 508 F.3d at 593; *Combo Maritime*, 615 F.3d at 605. For example, a vessel which allides with a bridge may argue that the bridge constitutes an unreasonable obstruction to navigation. *I&M Rail Link, LLC v. Northstar Navigation, Inc.*, 198 F.3d 1012, 1014-1016 (7th Cir. 2000). Or, a vessel may argue that the allision was caused by the improper placement of a navigational buoy. *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079 (5th Cir. 1979).

The second route requires the defendant to negate negligence. *S/Y Neraida*, 508 F.3d at 593; *Combo Maritime*, 615 F.3d at 605. Here, the moving vessel bears the burdens of production and persuasion, and the risk of non-persuasion. *The Louisiana*, 70 U.S. at 173; *Combo Maritime*, 615 F.3d at 605. The appropriate standard of care in this regime is based upon (1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules; and (3) recognized customs and usages. *S/Y Neraida*, 508 F.3d at 594; *Combo Maritime*, 615 F.3d at 605-6.

The third route places the most difficult burden on the defendant because, as a superceding causation argument, it can free the moving vessel from all liability. *S/Y Neraida*, 508 F.3d at 596; *Combo Maritime*, 615 F.3d at 606; *M/V Morgan*, 375 F.3d at 576-7.

> If a drifting or moving vessel offers as a defense that the collision was an unavoidable accident or vis major, '[t]he burden of proving inevitable accident or Act of God rests heavily upon the vessel asserting such defense.' The vessel must show that the accident could not have been prevented by 'human skill and precaution and a proper display of nautical skills[.]'

*James v. River Parishes Co.*, 686 F.2d 1129, 1132 (5th Cir. 1982). The case of *The Louisiana* was an Act of God case. There, the steamer "Louisiana" loosed her moorings in a stiff breeze and drifted into an allision with the steamer "Flushing" which was aground and out of the channel or course of passing vessels. *The Louisiana*, 70 U.S. at 173. The Court found that although the wind and tide had risen considerably, "[t]he drifting of this vessel was not caused by any sudden hurricane which nautical experience could not anticipate." *Id*. The Court concluded that the allision was caused by inadequate mooring and held the Louisiana liable for the allision damage. *Id*.

As noted, *supra*, the undisputed facts in the instant case reveal that Barge AGS-431B allided with the Bridge twice on May 1 – the first time when it loosed from its moorings and moved downstream and a second time during the initial removal attempt. Consequently, the Court concludes that the *Louisiana* and/or the *Oregon* presumption apply to both allisions in this case.[5] The Court will examine

---

[5] With respect to the initial allision, the parties dispute whether the barge was under the power of the M/V James L or whether it was drifting under the power of the current at the moment of impact. (Doc. 100 at 20, Doc. 104 at 14). However,

each allision separately to see if Matteson Marine and/or Alter Barge can successfully rebut this presumption.

<u>The Initial Allision</u>

As discussed, *supra*, the *Louisiana/Oregon* presumption is rebuttable through any of three ways. The defendant can demonstrate: (1) that the allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was the result of an inevitable accident. *M/V Morgan*, 375 F.3d at 573. Matteson Marine attempts to rebut the presumption by utilizing each of these three avenues. First, Matteson Marine argues that that allision was the fault of BNSF, because the Coast Guard has declared the Bridge to be an unreasonable obstruction to navigation. (Doc. 104 at 12-15). Second, Matteson Marine argues that the allision was an unavoidable accident, caused by a severe flood. (Doc. 104 at 26-29). Third, and finally, Matteson argues that it acted reasonably at all times. (Doc. 104 at 17-25). The Court will examine each argument, in turn.

a) Matteson Marine's Defense that the Allision was the Fault of the Bridge.

Matteson Marine argues that the allision was the fault of the Bridge because the Coast Guard has determined that the Bridge is an unreasonable obstruction to navigation. The Seventh Circuit has held that "If the Coast Guard may find [a] . . . [b]ridge an unreasonable obstruction . . . then so may the trier of fact in admiralty." *I&M Rail Link, LLC v. Northstar Navigation, Inc.*, 198 F.3d 1012, 1016 (7th Cir.

---

this fact is immaterial, as the Court's analysis will be identical under both the *Louisiana* rule and the *Oregon* rule. *See M/V Morgan*, 375 F.3d at 573. Consequently, the Court need not determine which of the two presumptions applies, and the Court will refer to both rules interchangeably.

2000). In such cases, the *Oregon* presumption is overcome, and the trier of fact is required to give an answer regarding fault without resorting to presumptions. *Id*.

While it is undisputed that the Bridge has been declared an unreasonable obstruction to navigation (Doc. 104 at 5, Doc. 108 at 3), liability will not arise unless the Bridge, by virtue of being an unreasonable obstruction to navigation, was a substantial and material factor in causing the allision. *M/V Morgan*, 375 F.3d at 572. An examination of the record reveals that the Coast Guard's determination that the Bridge was an unreasonable obstruction to navigation did not apply to the Bridge in its entirety. In other words, the Coast Guard didn't seek to have the Bridge torn down and replaced by a new bridge. Instead, the Coast Guard took issue with a small portion of the bridge – namely, that portion of the bridge through which vessels were expected to navigate. (Doc. 104-22). The Coast Guard had concluded that that the "swing-span" portion of the bridge was simply too narrow, and invited allisions by vessels attempting to navigate through it. (Doc. 104-22; Doc. 104-23; Doc. 104-24). Consequently, the Coast Guard required that BNSF remove the swing-span and replace it with a span that would provide approximately twice as much unobstructed horizontal clearance for passing vessels. (Doc. 104-22).

Matteson Marine does not allege that Barge AGS-431B allided with the swing span portion of the Bridge. Furthermore, BNSF notes in its Reply that Barge AGS-431 was lodged onto one of the piers of the Bridge, and not on the swing span portion of the Bridge. (Doc. 108 at 8). Furthermore, BNSF states that this allision in no way involved the height of the bridge, or any aspect of it being declared an unreasonable obstruction to navigation. (Doc. 108 at 8). The Court agrees.

Photographs in the record reveal that Barge AGS-431B was lodged on one of the piers of the Bridge (Doc. 100-23 at 8-9) and there is nothing in the record which contradicts this. Consequently, the Court concludes as a matter of law that Matteson Marine has failed to establish a causal link between the initial allision and the Coast Guard's determination that the Bridge is an unreasonable obstruction to navigation. As such, the fact that the Bridge is an unreasonable obstruction to navigation does nothing to rebut the *Louisiana/Oregon* presumption in this case.

b) Matteson Marine's Defense that the Allision was an Inevitable Accident.

Matteson Marine next seeks to establish that the allision in this case was caused by extreme flooding. To overcome the presumption of their negligence, Matteson Marine must prove that Barge AGS-431B came free due to *vis major* or inevitable accident, according to the principles established by the Supreme Court in *The Louisiana*. "It is well established that the affirmative defense of vis major or force of nature (formerly 'Act of God') is the concept of a natural force of such inevitability and irresistibleness that man cannot cope with it, either to predict, forestall it or control it when it arrives." *American River Transportation Co., Inc. v. Paragon Marine Services, Inc.*, 213 F.Supp.2d 1035, 1060 (E.D.Mo. 2002) (quoting *Woodbine Auto, Inc. v. Southeastern Pennsylvania Transp. Authority*, 8 F.Supp.2d 475, 481 (E.D.Pa. 1998)). The burden of proving an inevitable accident or an Act of God rests heavily upon the vessel asserting such defense. *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 926 (11th Cir. 2001) (holding that Hurricane Opal, which involved winds between 85 and 103.5 miles per hour, did not absolve

defendant of liability).  Consequently, "This defense [of inevitable accident] sensibly requires a showing that all reasonable measures would have been futile." *S/Y Neraida*, 508 F.3d at 596.

As evidence that all reasonable measures would have been futile, Matteson provides the following evidence: (1) on May 1, the Upper Mississippi River ("UMR") reached 20.5 feet, 5.5 feet above the flood stage at Burlington, which the National Weather Service considered to be a "major flood stage" and wind speed reached 20 miles per hour, with gusts up to 28 miles per hour; (Doc. 104 at 28) (2) the projections made on the National Oceanic and Atmospheric Association's website regarding river levels on the Upper Mississippi River are only "marginally accurate" and fail to take into account additional potential perils such as oscillation; (Doc. 104 at 28) (3) during the same week, two other barge breakaways occurred at other companies fleets; (Doc. 104 at 29) (4) an expert retained by Matteson Marine has opined, "Matteson Marine exhausted every reasonable and well planned procedure to maintain their fleets.  Extremely high water placed wear on their high quality equipment that was totally out of their control."; (Doc. 104 at 29) and (5) the Coast Guard promulgates an annual Waterways Action Plan to provide guidance to mariners in dealing with record flood stages, and BNSF cannot detail a single recommendation in that Plan which Matteson Marine failed to follow. (Doc. 104 at 29).

BNSF counters by arguing that Matteson Marine fails as a matter of law in this affirmative defense because it has failed to demonstrate that the flooding of the UMR was an event of such magnitude that there was nothing within Matteson

Marine's power that could have been done to stop Barge AGS-431B from breaking free. (Doc. 108 at 7). As evidence of this, BNSF notes that flood conditions on the UMR were prolonged, and none of Matteson Marine's other fleets broke away due to the flood conditions. (Doc. 108 at 7).

As a preliminary matter, BNSF appears to overstate the burden placed on Matteson Marine. Matteson Marine is not required to make a showing that all humanly-possible measures would have been futile to prevent the breakaway; rather, as stated, *supra*, Matteson must instead show that all *reasonable* measures would have been futile. *S/Y Neraida*, 508 F.3d at 596. Furthermore, "the defense cannot be sustained where it appears that the disaster was caused by negligence." *City of Chicago v. M/V Morgan*, 375 F.3d 563, 576 (7th Cir. 2004) (citing *The Clarita*, 90 U.S. 1, 13 (1874)). Consequently, the Court agrees that "the vessel that breaks loose from her moorings has the burden of establishing inevitable accident . . . and the burden is not easily met." *Martinez v. United States*, 705 F.2d 658, 661 (2d Cir. 1983) (finding party in custody of breakaway barge did not overcome burden by demonstrating that river currents were unusually swift); *see also, Swenson v. The Argonaut*, 204 F.2d 636 (3d Cir. 1953) (heavy burden not overcome by showing that vessel broke her moorings during thunderstorm involving sixty mile per hour winds). Applying the aforementioned law to the undisputed facts in this case, the Court concludes that Matteson Marine's defense of inevitable accident fails as a matter of law.

Assuming, without deciding, that the breaking of the 407-5 wire on the morning of May 1 was an inevitable accident, Matteson Marine still must prove that

the subsequent drifting of barge AGS-431B all the way from where it was moored to the point where it allided with the Bridge was also an inevitable accident. This issue of proof is a matter of common sense, as it wasn't the mere breaking of the 407-5 headwire which caused the allision, but it was instead the breaking of the headwire combined with the subsequent drifting of barge AGS-431B for a distance of approximately four and a half miles which led to the allision. *See, e.g., The Clarita*, 90 U.S. 1, 13 (1874) ("Unless it appears that both parties have endeavored by all means in their power, with due care and a proper display of nautical skill, to prevent *the collision*, the defense of inevitable accident is inapplicable to the case.") (emphasis added). To establish that the drifting of barge AGS-431B for a distance of four and a half miles was an inevitable accident, Matteson Marine must demonstrate that no reasonable means could have prevented it. If it is unable to show this, then an essential causal link would be missing and the allision would not constitute an inevitable accident. It is here that Matteson Marine undoubtedly cannot meet its burden.

It is undisputed that high water conditions such as those that existed in the days leading up to May 1, are tense, and the pilots have to be more vigilant, keeping their eyes on the fleets at all times. (Doc. 100 at 24). One of the important ways that Matteson Marine meets its obligation of keeping an eye on the fleet at all times is to station a tugboat in the harbor twenty-four hours a day, manned by a pilot and a deckhand. (Doc. 104 at 7). This practice is not unique to Matteson Marine, and it is standard practice in the fleeting industry. (Doc. 104 at 7).

On the morning of May 1, Captain Martinson and his deckhand, on the M/V Bette Lynn, were stationed approximately one and a half miles downriver from the 407-5 fleet. (Doc. 104 at 7). The M/V Better Lynn was the only manned vessel in the water during that period of time immediately preceding the breakaway (Doc. 100-2 at 4-5) and, being cognizant of this, Captain Martinson knew that it was incumbent upon him and his deckhand to be vigilant in watching for barge breakaways. (Doc. 100-2 at 12-13). Captain Martinson knew that it could be difficult to see a barge breakaway with the naked eye due to the darkness and various islands surrounding him. (Doc. 100-2 at 9-11). As a backup measure, Captain Martinson had a radar that he set to a two miles radius – a distance sufficient to include the 407-5 fleet. (Doc. 100-2 at 12). Captain Martinson knew that he needed to keep a close eye on the radar. (Doc. 100-2 at 13). However, Martinson testified that he did not look at the radar at all because his deckhand was sitting directly in front of the radar obstructing his view. (Doc. 100-2 at 13). Meanwhile, the barges broke free from their moorings and drifted down the river at a rate that did not exceed 10 miles per hour. (Doc. 100-2 at 11-12; Doc. 104-1 at 10). Two of these barges got stuck northeast of where the M/V Bette Lynn was stationed, and the remaining three barges drifted past Martinson and his deckhand without being detected. (Orr Dep. at 88-89;[6] Doc. 104-19 at 1) Martinson did not learn that

---

[6] Doc. 104-11 is represented by counsel for Matteson Marine on brief to be the deposition of William Orr. (Doc. 104 at 2). However, it is not. In Counsel's filings on the ECF, it is represented to be Doc. 104-16. However, this too, is not the deposition of William Orr. In fact, the Court is unable to find a copy of the deposition of William Orr in any of Counsel's attachments to his Response. (Doc. 104). In the future, it would behoove Counsel to not be so sloppy. Notwithstanding the foregoing, a courtesy copy of the deposition of William Orr (marked Exhibit 11)

the barges had broken free until he received a call from the company dispatcher informing Martinson that one of the three barges had allided with the MacArthur Highway Bridge, approximately one mile upstream from the BNSF Bridge. (Doc. 100-2 at 11).

While the Court does not question the "heroic efforts" employed by the crew of the M/V Bette Lynn and the M/V James L subsequent to the dispatcher alerting Martinson to the breakaway, the Court must conclude that Martinson was negligent in failing to keep a close eye on the barges, as evidenced by his failure to look at the radar. The Record clearly indicates that the radar was in good working order and the radar would have detected the barge breakaway. (Doc. 100-2 at 13; Orr Dep. at 110-11). This establishes causation, because a reasonable finder of fact would have no choice but to conclude that (1) had Martinson been watching the radar, he would have detected the breakaway at the moment the headwire snapped or very shortly thereafter and, consequently, (2) that Martinson's failure to detect the breakaway in a timely fashion cost him and the James L valuable time in reclaiming the three barges that drifted past the M/V Bette Lynn undetected. Viewing the evidence in the light most favorable to Matteson Marine, it took the barges of the 407-5 fleet no less than 15-20 minutes to drift downstream to the MacArthur Highway Bridge. Earlier detection would have garnered Martinson and Basham the majority of these minutes – minutes which Martinson and Basham

---

has been provided to the Court in the form of a courtesy copy. Considering the nature of the exhibit, the Court will allow it to be part of the Record, and will refer to it as "Orr Dep."

desperately needed so they could position themselves to meet the barges prior to the allision involving barge AGS-431B and the BNSF Bridge.

Matteson Marine admits as much in a statement against its own interest when its vice-president, Larry Matteson, Jr, testified as follows:

[Q] What did he [Martinson], what do you recall him telling you?

[A] Well, that, you know, just if they'd have had ten more seconds, they could have saved the barge. I mean, it was that close – they were so close to success that he was just heartbroken that, you know, they had failed to keep the barge from landing on the [BNSF] bridge, because, you know, it was just a matter of a few feet, steps, and a rope being attached, they could have, you know, they felt – he really thought that they could, they had a shot at preventing it, and didn't succeed, and he was upset about that.

Doc. 100-8 at 24.

Clearly, if Martinson had been keeping an eye on the radar, he and Basham would have had those "ten more seconds" – in fact, the Court has already concluded that they would have enjoyed a number of additional minutes. A reasonable finder of fact would have no choice but to conclude that these additional minutes would, more likely than not, have provided adequate time for the M/V Bette Lynn and/or the M/V James L to intercept the AGS-431B and prevent it from alliding with the Bridge.

For the foregoing reasons, the Court concludes as a matter of law that Matteson Marine was negligent and that this negligence contributed to the allision that occurred between barge AGS-431B and the BNSF Bridge. Consequently, the Court further concludes that Matteson Marine's affirmative defense that an act of God and/or inevitable accident caused the allision fails as a matter of law.

c)  Matteson Marine's Defense that it Acted Reasonably at all Times.

The Court has already concluded, *supra*, that Matteson Marine was negligent, and that this negligence contributed to the allision that occurred between Barge AGS-431B and the BNSF Bridge.  For this reason, the Court concludes that Matteson Marine's affirmative defense that it acted reasonably to prevent the allision fails as a matter of law.

d)  Conclusions of Law Regarding the Initial Allision

In light of the foregoing, it is clear that Matteson Marine has failed to prove any of the affirmative defenses necessary to rebut the *Louisiana/Oregon* presumption of fault.  By corollary, Matteson Marine has failed to demonstrate that any fault should be allocated to BNSF.  Consequently, the Court concludes as a matter of law that Matteson Marine is one-hundred percent liable for the damage caused by the initial allision between barge AGS-431B and the BNSF Bridge.

<u>The Second Allision</u>

As previously mentioned, Bill Carrier and John Stockman arrived on the scene of the allision on the morning of May 1 to lead the effort to extricate barge AGS-431B from the Bridge.  These two men, along with Randy Kirschbaum from Alter, devised a plan which called for "four-parting" a two-inch lock line and using the Bernard G to tow the barge off the Bridge with this line.  During the removal attempt, a line snapped and the barge drifted back downstream and allided with the Bridge.

BNSF asks the Court to rule as a matter of law that Matteson Marine and Alter are liable for the damage caused by the second allision by once again citing the *Louisiana/Oregon* presumption and arguing that Matteson Marine's and Alter's actions were not reasonable. Matteson Marine and Alter counter that their actions were reasonable under the circumstances. The Court has already determined, *supra*, that the *Louisiana/Oregon* presumption applies to the second allision. As such, Matteson Marine and Alter have the burden of proving that their actions were reasonable.

BNSF's argument that Matteson Marine was negligent in its efforts to remove the barge is well-taken. Matteson Marine's own expert, Deanne Orr, states in his report, "I think that the first attempt to rescue the barge from the bridge was not as thought out as it could have been . . . ." (Doc. 104-1 at 9). Bill Carrier, the principle designer and implementer of the plan, testified, "The way we did it the first time wasn't the best way to go . . . . [t]he most ideal way to go was the way we ultimately did it . . . with two large tow boats face-to-face." (Doc. 100-16 at 25). John Stockmann, the other marine surveyor who worked with Bill Carrier, stated, "I would have preferred to have gotten some other equipment down there [prior to attempting the first removal]." (Doc. 100 at 17). Finally, Randy Kirschbaum, explained, "The only thing is that I was very curious as to why . . . that equipment [referring to vacuum trucks] was not offered up to use before the first attempt to lighten the barge up and take pressure off the bridge and the barge." (Doc. 100-4 at 22). In light of this testimony, and the fact that Matteson Marine and Alter fail to cite any support in the Record indicating that the initial removal attempt was

reasonable, the Court must conclude that Matteson Marine and Alter have failed to demonstrate that their actions were reasonable. Consequently, the *Louisiana/Oregon* presumption stands unrebutted, and the Court concludes that Matteson Marine and Alter share one-hundred percent of the fault and liability for the second allision.

Notwithstanding the foregoing, even if the Court were to conclude that the actions of Matteson Marine and Alter might have been reasonable with respect to the removal attempt, it would make no difference as far as Matteson Marine is concerned. This is because the Court concludes that Matteson Marine is liable for the second allision for an additional reason, which the Court will now briefly discuss.

One of the classic principles of tort law is that a negligent tortfeasor is liable for all of those damages proximately caused by his negligence. *See, e.g., Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 101 (N.Y. 1928) ("We may assume, without deciding, that negligence, not at large or in the abstract, but in relation to the plaintiff, would entail liability for any and all consequences, however novel or extraordinary.") Indeed, proximate cause is a concept long recognized in admiralty law. "As in other tort contexts, in order for liability to be imposed in a maritime allision case, the fault must be the proximate cause of the injury." *Folkstone Maritime, Ltd., v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995), citing *The Java*, 81 U.S. 189, 193, 198-99 (1871); *The Farragut*, 77 U.S. 334, 338-39 (1870). Therefore, if Matteson Marine's initial act of negligence were to be deemed the proximate cause of the second allision, then liability would naturally attach.

While proximate cause is a concept that can frequently lead to scholarly discussions involving philosophy and public policy, no such discussion is merited under the facts of the instant case. Here, it is clear that Matteson Marine's act of negligence which contributed to the initial allision is sufficiently related to the second allision such that it must be deemed a proximate cause of the second allision. This is so, whether the Court applies a "foreseeability" test, a "substantial factor" analysis, or asks whether the second allision was a "natural and probable consequence" of Matteson Marine's negligence. *See generally, Foreseeability as an Element of Negligence and Proximate Cause,* 155 A.L.R. 157 (discussing the tests and elements of proximate cause). Consequently, even if Matteson Marine and Alter could prove that their actions were reasonable (which they cannot), Matteson Marine would still be liable for the damage caused by the second allision.

<u>Is Matteson Marine Entitled to a Limitation of Liability?</u>

The Limitation of Liability Act of 1851 ("the Act") was enacted to protect the American maritime industry by severely limiting shipowner's personal liability. It provides:

> The liability of the owner of any vessel, whether American or foreign, for any . . . loss . . . done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not . . . exceed the amount of value of the interest of such owner in such vessel, and her freight then pending.

46 U.S.C.App. § 183(a). BNSF argues that Matteson Marine is not entitled to limit its liability because it claims that Larry Matteson, Jr. had "privity or knowledge" of the cause or causes of the allision. (Doc. 100 at 27-31). In its Response (Doc. 104),

Matteson Marine fails to address this argument. The Court will now address the merits of BNSF's position.

In limitations proceedings, the ultimate burden of proving lack of privity or knowledge is on the shipowner. *In the Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1303 (7th Cir. 1992). "Privity or knowledge" is not tantamount to actual knowledge or direct causation. *Id.* All that is needed to deny limitation is that the shipowner, by prior action or inaction, sets into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty. *Id.*

The Court has already determined that Martinson's negligence in not carefully watching the barges, as evidenced by his failure to look at the radar, was a proximate cause of the initial allision, as well as the second allision. It is admitted that Matteson Marine had no policies or procedures regarding the duties of Pilots, such as Martinson. (Doc. 100 at 23). Furthermore, there is no evidence that Matteson Marine provided any training to Pilots regarding how to perform their duties. Finally, it is clear that Martinson was not properly supervised, as he always worked the night shift when the supervisors were not present. (Doc. 100-2 at 10, 15). Courts generally find the foregoing sufficient to deny a shipowner the benefits of the Act. *See, e.g., In the Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1303 (7th Cir. 1992) (citing lack of proper training and supervision in denying limitation of liability); *American River Transportation Company, Inc., v. Paragon Marine Services, Inc.*, 213 F.Supp.2d

1035, 1064 (E.D.Mo. 2002) (citing lack of policies and proper supervision in denying limitation of liability), *aff'd* 329 F.3d 946 (8th Cir. 2003).

Interestingly, Martinson claims that he knew he was supposed to watch the radar closely – yet he admits that he did not. (Doc. 100-2 at 13). Matteson Marine could thus argue that its lack of training, policies and supervision is irrelevant to the issue of whether it should be entitled to a limitation of liability, since there is no direct causation. However, Matteson Marine would be incorrect in such assertion.

While it may be true that Martinson knew that he should watch the fleet and radar closely, it is clear that Martinson did not take this duty as seriously as he should have. Perhaps this should come as no surprise, as Martinson's supervisors were never present when he worked. Regardless, the very real possibility exists that Martinson would have taken his duties a bit more seriously if he and the other pilots had been expressly informed of their duty to carefully watch the fleet/radar and had been properly trained and supervised in performing such tasks. Matteson Marine is unable to prove that this is not the case. As such, Matteson Marine is unable to prove that "by prior . . . inaction," it did not "set into motion a chain of circumstances which may [have] be[en] a contributing cause even though not the immediate or proximate cause of the casualty . . . ." *In the Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d at 1303. Consequently, the Court concludes that Matteson Marine is not entitled to limit its liability pursuant to the Limitation of Liability Act of 1851.

## Matteson Marine and Alter Barges' Motion for Partial Summary Judgment Regarding Damages.

BNSF has filed a claim for bridge repair and train delay for nearly $2 million, based on cost data from BNSF's financial statements. Matteson Marine and Alter Barge (collectively, "Matteson") argue that this figure is grossly inflated and unreasonable, and that part of it should be ruled as such as a matter of law. Matteson has offered two experts who support Matteson's conclusion that the total figure is inflated and unreasonable. (Doc. 106-4; Doc. 106-5). On the other side, BNSF has offered its own expert who opines that BNSF's method of calculating damages is reasonable with the caveat that he offers no opinion regarding the reasonableness/accuracy of the actual numbers used in BNSF's calculations. (Doc. 106-1 at 2-4).

There are six elements of damages discussed in BNSF's damages report (Doc. 101-5), which are as follows:

1. Train/Locomotive Delay and Related Crew Expenses in the amount of $1,332,670;

2. Maintenance of Way Labor in the amount of $200,185;

3. Costs Paid to External Vendors in the amount of $391.559;

4. Lost Amtrak Incentives in the amount of $10,620;

5. Detour Costs in the amount of $11,029;

6. Inspection Costs in the amount of $250.

Matteson does not contest the propriety, nor the amounts, of items 3-6.  (Doc. 106-4 at 5).   However, Matteson questions both the propriety and amounts of select components included in items 1-2.  (Doc. 106-4 at 5; Doc. 101, Doc. 98 at 2).[7]

BNSF arrives at its train delay figure of $1,332,670 by calculating the hourly operating expense for an average BNSF train in 2008 and then multiplying this expense by the total number of hours of train delay incurred as a result of the Bridge closure.  (Doc. 101 at 4).  The hourly operating expense takes into account all locomotive, car maintenance, servicing, leasing and labor costs.  (Doc. 101 at 4).  Consequently, the hourly figure includes fuel, depreciation, locomotive lease and rentals, repairs (parts and labor), payroll taxes, and rents.  (Doc. 101 at 4).  BNSF has calculated that the average hourly cost to operate a train in 2008 was $676.27.  (Doc. 101 at 4).  On top of this $676.27 hourly rate, BNSF adds $166.01 per hour for train crews, which includes a 245% overhead rate added to direct labor costs, making the total hourly rate per train per hour of delay equal to $842.28.  (Doc. 101 at 5).  Matteson argues that this formula may not be used to establish BNSF's train delay damages and, therefore, that the Court should rule as a matter of law that BNSF has failed to establish its entitlement to train delay damages.  (Doc. 101 at 8).  Matteson supports this argument by explaining that the trains delayed in this case were not operating under normal conditions and, therefore, it is improper to apply in this case an hourly cost model based on a fleet of trains operating under normal conditions.  (Doc. 101 at 13-15).

---

[7] In the Motion for Partial Summary Judgment as to damages (Doc. 101), Matteson only contests the charges for train delay and related crew expenses.  Consequently, at this time, the Court will only address item 1, *supra*.

As an example of the injustice that can result from the use of BNSF's hourly cost model, Matteson directs the Court's attention to BNSF's charge for fuel and related services. BNSF's charge for fuel and related services totals $761,522 and comprises 57% of BNSF's total train delay figure. (Doc. 101 at 12). Matteson argues that the $761,522 figure is patently unreasonable because the trains that were delayed in this case were idling or shut off and, consequently, using little or no fuel. (Doc. 101 at 12-13). Matteson also alleges that the costs factored into the hourly train delay rate could have been measured directly. (Doc. 101 at 11-15). Consequently, Matteson alleges that the decision by BNSF to apply an average hourly operating cost to the trains delayed in this case is unfair because a more accurate means of calculating BNSF's damages existed, and because BNSF's cost model inflates BNSF's damages. Thus, Matteson argues that BNSF has failed as a matter of law to prove its damages to a reasonable degree of certainty. (Doc. 101 at 7, 12-13).

In order to address Matteson's concerns, the Court must first briefly address the law of damages in admiralty law. In admiralty, the underlying principle for all theories of damages is restoration to the previous condition. *Gateway v. American River Transportation Co.*, 877 F. Supp. 201, 202 (C.D. Ill. 1995), *citing*, *The Baltimore*, 75 U.S. 377, 385 (1869). Property owners must therefore be "compensated fully for all losses incurred, in a manner which will restore them to the condition which would have existed had the casualty not occurred." *Gateway*, 887 F. Supp. at 203. Consequently, if there is liability, the property owner is entitled to be made whole. *Id*.

In admiralty, damages for loss of use is well recognized. *Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170 (1932); *Continental Oil Co. v. SS Electra*, 431 F.2d 391 (5th Cir. 1970). Such damages are referred to as "detention damages." *Continental Oil Co.*, 431 F.2d at 393 FN1. Detention damages are available when a vessel negligently strikes a shore structure. *See, e.g., Crown Zellerbach Corp. v. Willamette-Western Corp.*, 519 F.2d 1327 (9th Cir. 1975); *Gateway Western Railway Co. v. American River Transportation Co.,* 887 F.Supp. 201 (C.D. Ill. 1995). How detention damages are calculated in such a situation, however, varies. The Supreme Court has explained that an award of damages must be reasonably related to the setting of the circumstances creating the loss; and "only when thus enlightened can we choose the yardstick most nicely adjusted to be a measure of reparation, in some instances, no doubt, the hire of [a substitute], in other instances, it may be, a return upon the idle capital, in others something else." *Brooklyn Eastern District Terminal*, 287 U.S. at 174; *accord, National Steel Corp., v. Great Lakes Towing Co.*, 574 F.2d 339, 345 (6th Cir. 1978) (damages for production delay allowed and measured by the difference between cost of purchasing substitute steel and production cost of making such steel); and *Continental Oil Co. v. SS Electra*, 431 F.2d 391, 393 (5th Cir. 1970) (Oil producer entitled to recover lost profits where oil production was suspended for 130 days due to allision damage to its oil platform, even though oil producer did not lose any oil as a capital asset in the short or long run).

In determining the appropriateness of items claimed as damages, the Court is guided by general principles of equity and justice. *United States v. Peavey Barge*

*Line*, 748 F.2d 395, 399 (7th Cir. 1984). In accordance with these principles, both the yardstick used to establish damages and the amount claimed as damages must be reasonable in light of the circumstances. *Brooklyn Eastern District Terminal*, 287 U.S. at 174. Furthermore, Plaintiff must demonstrate that the damages claimed were proximately caused by Defendant's negligence. *United States v. M/V Gopher State*, 614 F.2d 1186, 1190 (8th Cir. 1980). Applying these principles to the facts of the instant case, it follows that "Plaintiff is only entitled to any [damages] *directly* resulting from the bridge being out of commission." *Gateway Western Railway Co.*, 887 F.Supp. at 203 (emphasis added).

It is admitted that, as a direct result of the allisions, BNSF suffered damages that exceeded the cost of repairing the Bridge. Such damages would include BNSF's loss of use of its capital investment in the Bridge, as well as in certain locomotives and employees affected by the Bridge shutdown and/or repair. As such, BNSF is entitled to recover from Matteson the value of this loss of use. However, it must be remembered that BNSF is not permitted to profit from this loss and may only be made whole. *See United States v. M/V Gopher State*, 614 F.2d 1186 (8th Cir. 1980).

The yardstick BNSF has chosen to measure its loss of use/detention damages is the total operating costs of the trains delayed/idled by the Bridge closure for repairs based upon the hourly operating expense for an average BNSF train in 2008. Unfortunately, the parties have not cited and the Court's research has not revealed any case law teaching the appropriate measure of detention damages under the circumstances of this case. During the period of time the Bridge was

closed, BNSF's trains were idle without the opportunity to generate any revenue to offset their ongoing operating expenses – expenses reasonably likened to be the break-even point of profitability for this aspect of BNSF's overall operations. Based on the summary judgment record, the Court cannot say, as argued by Matteson, that as a matter of law the measure of detention damages proffered by BNSF is patently inappropriate under the circumstances of this case entitling Matteson to partial summary judgment with respect to damages. Instead, the Court will permit BNSF to seek damages for loss of use, with the understanding that BNSF will have the burden of proving that such damages, as reflected by the hourly formula, are reasonable – both in scope and amount.

As mentioned, *supra*, Matteson argues that BNSF's hourly cost model is not narrowly tailored enough to the facts of the instant case and, consequently, that BNSF will be unable to meet its burden of proving loss of use damages to a reasonable certainty. However, the Court does not agree with the proposition that, as a matter of law, the hourly formula is inadequate proof of BNSF's damages stemming from loss of use of the Bridge. First, the hourly formula takes into account a number of factors for which loss of use damages may be recouped, if properly justified and proven – including overhead. *See, e.g., Baltimore and Ohio Railroad Co. v. Commercial Transport, Inc.*, 273 F.2d 447 (7th Cir. 1960) (where railroad repaired damages caused by crossing collision between locomotive and truck, railroad could recover as damages not only the direct expense involved in repair, but also the overhead expense as calculated by a formula utilized by railroads in charging one another for repairs). Second, the hourly formula is based

on a rational benchmark that takes into account all fixed and variable costs associated with operating a locomotive – namely, the cost of operating a fleet of locomotives for a year broken down into an overall hourly rate per locomotive. Matteson also claims that a more reasonable method of measuring BNSF's loss of use damages existed – namely, adding up each and every expense individually for each and every one of the 64 trains delayed by the Bridge closure. (Doc. 101 at 11-15; Doc. 105 at 8). Putting questions of feasibility aside, it is not clear to the Court at this stage that Matteson's preferred method is superior to BNSF's method. While BNSF's method appears to have inflated its costs, Matteson's model would inevitably undervalue BNSF's costs because it would fail to take into account overhead expenses and would likely fall short of accounting for the full economic loss sustained by BNSF. Under the facts of this case, it would be improper for the Court to conclude that BNSF is not permitted to use its preferred method of proving damages just because a better or more accurate method might theoretically have existed. While the Court agrees that BNSF's method appears to have some deficiencies, it is not so unreasonable as to warrant judgment as a matter of law for Defendant. *See United States v. John J. Felin & Co.*, 334 U.S. 624, 643-44 (1948) (Reed, J., Black, J., Murphy, J., concurring) ("[T]o say that a manufacturer who proves . . . cost by the results of his own system of cost accounting may not retain his award because a more accurate accounting system exists, though not offered in evidence, disregards the salutary rule that litigants in civil matters must be allowed to frame their issues and prove their cases in trial courts as each desires.") Consequently, the Court declines to accept Matteson's invitation to declare that

BNSF's train delay claim fails to meet the standards of admiralty law for proving damages. Accordingly, Matteson's Motion for Partial Summary Judgment (Doc. 101) is DENIED.

Notwithstanding the foregoing, this Opinion should not be read to imply the Court's endorsement of the manner by which BNSF now attempts to prove its loss of use damages. Indeed, the Court has some serious concerns regarding the accuracy of BNSF's hourly delay figure and the appropriateness of certain components included in its calculation. For example, because it appears that many of the affected trains were idling or shut-off during the Bridge closure, the Court is concerned that the fuel cost built-in to BNSF's hourly delay formula may be grossly inflated due to the formula's use of time, rather than miles driven, as the cost driver. It will be BNSF's burden to prove that this concern is unwarranted.

Furthermore, the Court has some serious concerns regarding the amount claimed by BNSF for overhead expenses. With respect to BNSF's claim for train delay, BNSF's hourly formula includes an amount of overhead for train crews which equates to 245% of BNSF's direct expenditure on train crews.[8] An examination of overhead damages awarded (or not awarded) in other cases reveals that 245% is an unprecedented figure. *See United States v. Peavey Barge Line*, 590 F. Supp. 319 (C.D. Ill. 1984) (awarding overhead of 16% of labor costs), *aff'd* 748 F.2d 395 (7th Cir. 1984); *Baltimore and Ohio Railroad Co. v. Commercial Transport, Inc.*, 273 F.2d 447 (7th Cir. 1960) (affirming judgment awarding 26.42% overhead for

---

[8] The Court also notes that BNSF seeks to collect an amount of overhead expenses for maintenance of way labor which exceed the direct maintenance of way labor charges by 270%.

maintenance of way labor); *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300 (9th Cir. 1976) (affirming award of overhead costs in amount of 22%); *Shappert Eng'g Co. v. Steel City Marine Transp., Inc.*, 620 F. Supp. 1377 (E.D. Mo. 1985) (declining to award overhead of 33% on grounds that it was not justified or reasonable); *United States v. M/V Gopher State*, 472 F. Supp. 556 (E.D. Mo. 1979) (finding claimed overhead of 67% to be unreasonable and highly excessive); *aff'd* 614 F.2d 1186 (8th Cir. 1980); *but see United States v. Am. Commercial Barge & Line Co.*, No. 88-1793-C-7 (E.D. Mo. Sept. 30, 1991) (awarding overhead of 110% of labor costs). While there exists no bright line rule regarding when an overhead expense is *per se* unreasonable, the Court believes that BNSF's overhead figure of 245% is patently unreasonable, and the burden will be on BNSF to prove otherwise.

Additionally, the Court notes that BNSF originally calculated its train delay expenses to be $798,386.53, yet it now claims that the proper amount of damages attributable to train delay should be $1,332,669.45. (Doc. 101-5 at 12). This reflects an increase of approximately 67%. Courts generally view large increases such as this unfavorably – especially when they are not fully explained and justified. *See, e.g.*, *United States v. M/V Gopher State*, 472 F. Supp. 556 (E.D. Mo. 1979) (finding revised overhead amount of 67% to be unreasonable and highly excessive in light of fact that earlier estimate of overhead was 20%); *aff'd* 614 F.2d 1186 (8th Cir. 1980). Consequently, BNSF will have the burden of convincing the Court that this increase was both reasonable and necessary.

In light of the foregoing, the Court concludes that a trial on the issue of damages is necessary. Notwithstanding this, BNSF is reminded that the granting

or withholding of damages rests with the discretion of the Court, which is entitled to base its decision upon principles of equity and justice. *Peavey Barge Line*, 748 F.2d at 399. As such, to the extent that BNSF fails to prove its entitlement to what appear to be excessive damages, the Court will not hesitate to deny and/or reduce the damages sought by BNSF.

<u>Matteson Marine and Alter Barges' Motion to Exclude Testimony of Arlen Lasinsky</u>

Matteson Marine and Alter Barge Line (collectively, "Matteson") have filed a motion seeking to bar an opposing expert witness. (Doc. 98). Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact ... a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion ..." It also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. *Id.*

Rule 702 requires the district court to perform a "gatekeeping" function before admitting expert scientific testimony in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993). *See*, *Gayton v. McCoy* 593 F.3d 610, 616 (7th Cir.2010).

Under the *Daubert* framework, the district court must determine whether a given expert is qualified to testify in the case in question and, if so, whether his testimony is reliable. *Daubert* 509 U.S. at 592-93. "Whether a witness is qualified

as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990).

In determining reliability, *Daubert* sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the professional community. *Daubert,* 509 U.S. at 593-94, 113 S.Ct. 2786. The Court should also consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000).

Arlen Lasinsky is a CPA, with over thirty years of experience as an auditor. (Doc. 106-1 at 16). The figures used by Lasinsky are derived from audited financial statements and reports required by the Surface Transportation Board (STB), and cost data provided by BNSF. (Doc. 106-1). Matteson does not contest the accuracy or reliability of these figures, recognizing that they are derived from "audited and certified reports of various financial and regulatory documents." (Doc. 106-5 at 1).

Lasinsky's testimony also fulfills the second requirement that the testimony be the product of reliable principles and methods. Lasinsky's testimony about overhead is based on principles of Managerial or Cost Accounting, used by company managers for internal decision making because it more accurately reflects total costs and information that managers value. (Doc. 106-1 at 25). In this regard,

Lasinsky relies on principles stated in accounting textbooks, such as Introduction to Managerial Accounting, a textbook cited by Lasinsky in his Report. These materials recognize that elements of cost include direct material, direct labor, and overhead, and Mr. Lasinsky applied these elements to the data. Drawing from accounting sources, Lasinsky opines that overhead can reasonably be allocated to direct costs because "it would be cost prohibitive or too burdensome to keep records for each of these costs and attribute those costs to each individual finished product." (Doc. 106-1 at 5). In his rebuttal report, Lasinsky recognizes that fixed costs typically vary directly with revenue volume, which is additional support for his opinions about the appropriateness of the overhead calculations in this case. (Doc. 106-2 at 4).

On the issue of the train delay calculation, Lasinsky has reviewed BNSF's methodology. Moreover, he provides his insights as to why an average cost calculation is appropriate in the instant case where the question is the "value" of loss of use, and all of the tangible effects of bridge closure are not subject to ready or convenient qualification. Again, applying principles of cost accounting, he has assembled and reviewed the testimony of BNSF personnel and lays out why he thinks their average cost calculation is reasonable.

Finally, Lasinsky has applied the principles and methods reliably to the facts of this case. Lasinsky's Report notes that the calculations of damages were determined by applying Cost Accounting principles to data found in an Annual Report that BNSF had previously filed with the STB. The information contained in this Annual Report is the same information that is reflected in the audited financial

statements.  In order to calculate the value of the loss of the Bridge, BNSF calculated the per hour cost to put a train in road service based on its Annual Report filed with the STB in 2008.  This per hour cost was then applied to 64 trains that were delayed over an estimated 38 hour period of delay.

Lasinsky's testimony also meets the *Daubert* criteria for admission of expert testimony.  Lasinsky meets the first Daubert standard that the reasoning and methodology used be tested and scientifically valid.  BNSF used Managerial or Cost Accounting in determining the amount of damages incurred due to the accident.  As explained in Lasinsky's Report, under Cost Accounting, "managers set their own ground rules concerning the content and form of internal reports.  The only constraint is that the expected benefits from using the information should outweigh the costs of collecting, analyzing, and summarizing the data."  (Doc. 106-1 at 5).  These principles are taught in accounting textbooks such as Introduction to Managerial Accounting, cited by Lasinsky in his Expert Report.  Introduction to Managerial Accounting explains that Cost Accounting produces reports that are more useful for internal decision making than Generally Accepted Accounting Principles (GAAP).  (Doc. 106-1).  This explains why managers are free to set their own ground rules concerning the content of internal reports under Cost Accounting.

Lasinsky's testimony also meets the second *Daubert* requirement.  Cost Accounting, the methodology used here, is a technique that has been subjected to peer review and/or publication.  As noted above, Cost Accounting is discussed in journal articles and taught in accounting textbooks, such as Introduction to Managerial Accounting.

The third criterion is difficult to apply, because there is no known or potential rate of error regarding decisions to include or exclude costs. While the data itself is accurate, it is up to the manager to determine which costs should be included and which ones shouldn't. While the Court has some concern (which has been noted, *supra*) regarding the potential for costs to be inflated using Cost Accounting, the Court believes that this can be effectively dealt with via cross-examination, rather than by an exclusionary rule.

Finally, Lasinsky's opinions meet the fourth Daubert standard that the technique has been generally accepted. In the accounting community, Cost Accounting is a generally accepted method and principle. (Doc. 106-1). As Introduction to Managerial Accounting explains, Cost Accounting is widely used by businesses for internal reporting. Cost Accounting is preferred to GAAP in this context because it more accurately reflects costs and provides managers better information when making internal decisions. (Doc. 106-1).

After carefully considering Matteson's motion to exclude, the Court concludes that Matteson's concerns with Arlen Lasinsky go more to the weight and credibility of his testimony than whether it is properly excludable. Consequently, Lasinsky will be permitted to testify as an expert for BNSF at trial.[9]

---

[9] Notwithstanding the foregoing, the Court does not find the concerns of Matteson to be devoid of merit. Indeed, the book cited by Matteson and BNSF, Introduction to Managerial Accounting, has a heading entitled "Beware of Allocated Fixed Costs." In that section it states, "One of the great dangers in allocating common fixed costs is that such allocations can make a product line (or other segment of a business) *look* less profitable than it really is." (emphasis in original). (Doc. 98-25 at 22). *See also, Kansas Gas & Elec. Co. v. U.S.*, 95 Fed. Cl. 257, 308 (2010) ("The court has no quarrel with [the expert witnesses'] characterization of [the claimant's] use of . . . cost accounting for business purposes [as reasonable] . . .. However, what makes for

## CONCLUSION

For the foregoing reasons, BNSF's Motion for Summary Judgment as to Liability (Doc. 100) is GRANTED; Matteson Marine Service and Alter Barge Lines' Motion for Partial Summary Judgment with respect to damages (Doc. 101) is DENIED; and Matteson Marine Service and Alter Barge Lines' Motion in Limine to Exclude Expert Testimony (Doc. 98) is DENIED. This case is set for telephone status conference on August 15, 2011 at 10:15 am to set a trial date if the parties are unable to reach settlement on the issue of damages. IT IS SO ORDERED.

Entered this 13th day of July, 2011.

                                                    s/ Joe B. McDade
                                              _____
                                                    JOE BILLY McDADE
                                              United States Senior District Judge

---

good business accounting does not translate automatically into a fair and reasonable apportionment of damages.") Suffice it to say that the Court will be listening carefully at trial to determine whether Lasinsky's calculations present a fair and reasonable apportionment of damages.